Wednesday, 4 October 2023

Provided to Suwannee Correctional Institution on:
OCT 04 2023
for mailing, by: [signature]
TMW

TO: The U.S. District Court, M.D. Fla.

Office of the Governor

3:23-cv-1177-BJD-JBT

The U.S. Department of Justice

Florida Division of Administrative Hearings

The Florida Dept. of Corrections, Office of Health Services

The Florida Dept. of Corrections, Regional #2 Director

From: Mr. Tyson N. Watson D.C. #195947
Suwannee Correctional Institution — Main Unit
H-Dormitory
5964 U.S. Highway 90
Live Oak, Florida 32060-8694

# NOTICE

COMES NOW, Tyson N. Watson, to notify you that my mental well-being and personal safety are both in jeapordy. I am at imminent risk of substantial harm in my current state. Though I am a state prisoner in the custody of the Florida Dept. of Corrections, who is responsible for my well-being and safety, they

1 of 20

have failed in this regard.

## I. Historical Background of Mental Health Problems

Presently, I'm a patient in the mental health program at Suwannee Correctional Institution's H-Dorm where the Crisis Stabilization Unit and Transitional Care Unit are located. Prior to my current admission to T.C.U. on 25 May 2023 I'd suffered from mental illnesses, such as Bipolar Disorder and Post-Traumatic Stress Disorder (PTSD). Even before my incarceration in 2002 I'd been mentally ill since early childhood, and under direct psychiatric care since 1987.

On 11 August 1982 I was five years of age when I received a psychological evaluation by Dr. Irene M. Gurri, Ph.D., clinical psychologist at the University of Miami Mailman Center for Child Development. This was prompted by reports of my sudden outbursts. Dr. Gurri recommended psychotherapy and follow-up reevaluation.

On 24 December 1985 U.S. Air Force Captain Andrew B. Kairalla, at Homestead Air Force Base, evaluated me for possible psychotherapy, and rendering a provisional diagnosis for psychosis.

On 7 July 1986 the ESE Central Office Art Therapist Janet Bush completed her Assessment Report, finding that I had difficulty expressing my thoughts and feelings. Through drawings I attempted to express my experiences with alters and dissociations, related to trauma from childhood abuses.

On 3 April 1987 Metro-Dade County Police baker-acted me in Jackson Memorial Hospital after I banged

my head until it bled. On 4 April 1987 I was admitted to Charter Hospital of Miami.

On 7 April 1987 and 9 April 1987 Dr. Ana A. Rivas-Vazquez, Ph.D., clinical psychologist at 'Charter' completed a psychological evaluation on me, rendering an Axis I diagnosis of Bipolar Affective Disorder, mixed with psychotic features. She recommended residential treatment due to the long-standing nature and severity of my condition.

Thrice, from 21 April 1987 through 6 May 1987 Licensed School Psychologist P.L. Escovar evaluated me at 'Charter' for inpatient psychiatric care. I explained to him that my 'rages' fell out of control and were a big problem for me. The examiner noted the results of my EEG indicated seizure activity within the occipital lobe which might explain why I was having uncontrollable rages.

On 3 June 1987 Dr. Juan Osvaldo Pagan completed a psychiatric evaluation on me at 'Charter', where the attending physician noted how, within hours of my admission, I was placed in 24 hour seclusion; which was used several times, and during which my moods were unstable and my behavior inconsistent. In seclusion I behaved bizarrely, tore my clothes and spit on myself. I had to be sedated and placed in a restraint jacket.

Diagnostic tests indicated depression, abnormal EEG due to the presence of organic occipital sharp waves, and an absence of gamma-aminobutyric acid, a contributing factor to PTSD.

After leaving 'Charter' I was admitted to Alternate Family Care Services, a psychiatric residence in Hollywood, for four years. From there, I was inpatient at the private psychiatric hospital, Manattee Palms, for four months, in Bradenton, Florida.

From there, I was admitted to Montanari Residential Treatment Center, in Hialeah, Florida until I turned 18 years of age. While at 'Montanari' Dr. Irene M. Gurri, Ph.D. examined me from 19 October 1993 to 22 October 1993 in a psychological evaluation.

Dr. Gurri noted that I suffered several diagnoses, including Bipolar Affective Disorder mixed with psychotic features, Multiple Personality Disorder, and chronic PTSD. These, she linked directly to me being physically and sexually abused as a child.

After I left 'Montanari' in 1995 I was Baker-Acted at least ten times because I was unable to function, adapt to, and integrate within outpatient settings of open society. As evident prior to my 2002 incarceration, and unchanged since my current committment to the Florida Department of Corrections (FDC) I thrive better in inpatient settings, but decompensate in a spiral in outpatient settings, and also under stressful and oppressive conditions.

## II. Deterioration of Mental Health In Prison

My inability to function well under stressful and oppressive prison conditions have resulted in me being admitted to CSU and TCU numerous times since being placed in Close Management (CM) on 20 May 2004, which, CM, is a restrictive form of seclusion, isolation in a special housing status. My continuous isolation in CM for nearly twenty consecutive years has been to my detriment.

Simply put, I cannot cope well in long-term isolation and have resorted to self-harm as a maladaptive coping skill scores

4 of 20

of times. And while CSU and TCU should have allowed me a safe place to regroup, this cannot happen when the CSU and TCU are located where abuse and mistreatment is rampant and my levels of stress, and especially post-traumatic stress, runs dangerously high.

The CSU and TCU programs at Suwannee Correctional Institution's (SWCI) Main Unit in H-Dorm are mismanaged in a way that not only harms me physically, but especially threatens to push me over the edge towards suicide! The current state of H-Dorm poses a significant risk of substantial harm to me. PLEASE HELP ME!!!

## III. Recurring Deficits In Treatment In H-Dorm

1. Patients are served meal trays with food crusted on them left from previous meals, some even appearing to have mold on them.

2. Though nursing staff document the amount of food a patient eats at each meal, nursing staff are never present during meal time to determine the amount fed, leaving starved patients unchecked.

3. It is common for patients to be served trays without food on them, by guards, if staff want this. These 'air trays' persist as an unlawful disciplinary and retaliatory tool against patients.

4. Nursing staff do not conduct wellness check rounds on each patient every two hours, as required.

5. Dr. Islam, M.D. routinely disregards a patient's medical needs until it becomes worse than when first brought to his

5 of 20

attention.

6. The back windows of patients' cells are sprayed with an opaque content that prevents patients from looking out the back window. Yet, staff routinely order patients not to look out of the observation window of the cell door, a sensory deprivation.

7. Usually, the cells are left filthy, contaminated with mucus, blood, feces, urine, and other biological matter that staff do not ensure is cleaned with toilet brush, mop, broom, et cetera.

8. Often, when patients intentionally harm ourselves by cutting, head-banging, disembowelment, stabbing foreign objects into the body, et cetera, staff wait until the patient is unresponsive, for hours or even days, before gaining us access to medical attention.

9. After a patient harms himself, often the guards and even nurses will beat the patient in the medical treatment room; and even when nurses don't actively participate in beating us, they passively watch and don't intervene or report it.

10. Even in the absence of self-harm to provoke a beating, staff abuse still occurs in blindspots out of the cameras' viewing range. If a patient angers a staff, at any point afterward, he is subject to physical abuse by staff in a blindspot.

11. Mental health staff rarely report when they witness staff abusing a patient; and oftentimes when the abuse is suspected to be imminent the mental health staff deliberately leave the area, or else deny the abuse occurred when witnessed.

12. Many times the stressors from mismanagement in H-Dorm cause patients to declare psychological emergencies to guards. When patients declare so while locked in the cell guards usually ignore it or delay their response until self-harm occurs. However, when patients declare so during out-of-cell activity, and while secured in restraints (handcuffs and shackles), under direct staff supervision, and unable to easily self-harm, the guards return the patient to his cell, remove all his restraints, and leave him unsupervised in his cell where he can easily engage in self-harm.

13. For any reason or none at all, a patient's mail is discarded by guards, as well as his personal property taken and not returned. Likewise, inmate grievances of certain natures are not logged and processed by staff. Apparently, they are disposed of.

14. Guards routinely misuse the property restriction procedure against patients to remove personal property, clothes, mattress, linen, et cetera, from the cell, leaving the patient barefooted and in his undershorts only, with but a cold cell and concrete or metal bunk to sleep on for several days. This arbitrary, barbaric, and inhumane common practice is used by guards for reasons not outlined in prison policy, though the guards falsify their report with untrue reasons in order to justify such abuse.

15. Many of the outdoor recreation cages are left damaged by guards who fail to put work orders in to have them repaired. The damaged cages are left this way for very long periods so that the less cages available for use the more patients will be denied access to outdoor recreation.

16. For the patients who attend weekly group therapy in the group room the guards handcuff each patient behind the back and then lock a chain to the handcuff, the other end of which is bolted to the floor. For the hour-long group each patient is handcuffed behind his back, seated on a steel bench and immobilized in a discomforting and painful manner by the floor-bolted chain locked to the handcuffs. Patients who attend individual counselling sessions in the group room are immobilized in this same discomforting and painful manner.

17. The psychiatric provider, Ms. Rebecca Bertone, Psychiatric Mental Health Nurse Practicioner, has a custom of removing a patient's long-standing mental health diagnosis, such as Bipolar Disorder, and replacing it with a less serious disorder, such as Borderline or Antisocial Personality Disorders, based upon which she then discontinues the patient's psychotropic medication that the patient had been receiving as treatment for his serious mental health diagnosis. In this way, the patient isn't properly medicated and when the patient then acts out, he is misnomered a management problem with a 'personality' dysfunction.

18. Most often, guards refuse to let patients appear at the hearing for any Disciplinary Report the patient may receive, then falsely documenting that the patient willingly refused to appear.

19. Should a patient witness staff abusing another patient staff rarely, if ever, offer the patient a Witness Statement form to complete, even when the patient requests one, which violates prison policy.

20. It is not uncommon for guards to damage the e-tablet assigned to the patient who angers staff.

21. Often, when a patient voices his complaint, verbally or in writing, about issues of mismanagement in H-Dorm, and that patient's complaining is deemed a nuisance, security, mental health, medical, and classification staff members of H-Dorm's Multi-Disciplinary Services Team (MDST) will gather to agree for that patient to be discharged from the CSU or TCU program even before the patient is able to cope yet with the stressors in outpatient settings, such as prison's general population or CM.

22. The ombudsperson does not make rounds through H-Dorm's inhabited quads on a weekly basis. And when the ombudsperson does make rounds occasionally, there is no meaningful advocacy and referral for patients aggrieved about mismanagement in H-Dorm.

---

FDC, at the Central Office level of the Office of Health Services-Mental Health Director, as well as the FDC's Director of Region Two, and the H-Dorm MDST and SWCI's Assistant Warden of Programs, are all responsible for H-Dorm patients' mental well-being and personal safety.

The recurring deficits enumerated above demonstrate their failure in the duty to adequately care for H-Dorm patients.

In H-Dorm Lieutenant Courtney Knight and Sergeant Brian Peacock manage with an iron fist of abuse and mistreatment. Lt. Knight and Sgt. Peacock are involved in a sexual affair, and together they lead staff by example to

abuse patients. I've witnessed patients being beaten by guards which traumatizes me terribly.

Most recently, Officer C.D. Smith beat a handcuffed Inmate Alex Knight D.C.#183490 in H-Dorm, Quad #4's group room after the patient declared a psychological emergency on 7 September 2023.

When I complained about this Lt. Knight and Sgt. Peacock threatened me with violence. Previously, on 12 July 2023 Lt. Knight, Ofc. Smith and Ofc. C. Butcher attacked me while escorting me in the H-Dorm sallyport hallway between Quad #3 and Quad #4. I was punched, kicked, choked, and digitally penetrated sexually by them and knocked unconscious.

Though I was in severe pain, was bleeding from my head, had numerous large bruises on my torso and limbs, and was unable to move my arm and turn my head completely without serious pain for several weeks afterward Lt. Knight told me I'd suffer worse if I denied her claim to medical staff that my only injury was a self-inflicted gash on my head.

So, on 7 September 2023 Lt. Knight and Sgt. Peacock (and later, Ofc. Smith) reminded me of that 12 July 2023 abuse and Sgt. David Duckwiler also who, on 4 July 2022 assaulted me in H-Dorm, Quad #4's grouproom after I reported staff misconduct.

Sgt. Duckwiler told me that the same way he caused me to be beaten on 13 September 2022 after my July 2022 report on him and subsequent transfer to Santa Rosa Correctional Institution, that him and Lt. Knight would get me killed if I reported staff misconduct again and was transferred back to Santa Rosa Corr. Inst. again.

On 29 September 2023, early on the 8:00 am to 4:00 pm shift, Lt. Knight and Sgt. Peacock were in H-Dorm inspecting Quad #4 before the arrival of the audit staff who would interview select patients in H-Dorm.

I advised Lt. Knight and Sgt. Peacock that if I was on the list to be interviewed by audit staff then I wished to participate. At this, Lt. Knight and Sgt. Peacock asked me why I appeared so enthused to be interviewed by audit staff, to which I replied that since no ombudsperson made rounds on Quad #4 in the past two weeks and since many of my prison grievances about mismanagement and staff abuse in H-Dorm were being intercepted before they could be logged or responded to, that I was looking forward to informing the audit staff about the rampant mismanagement and staff abuse in H-Dorm.

Lt. Knight and Sgt. Peacock then told me they would make sure that no audit staff interviewed me and that since I intended to inform on staff misconduct then they both would have me beaten up later on that day after the audit staff left.

No audit staff were permitted in H-Dorm, Quad #4 where I am housed, nor was I permitted to be interviewed by audit staff.

Later that day on the next shift of 4:00 pm to 12:00 am Officer R.W. Mace and Officer C. Campos began pulling patients in H-Dorm, Quad #4 out of their cells for dayroom activity. Ofc. Mace pulled me out of cell #H-4106 and escorted me to the shower. Meanwhile, Ofc. Campos pulled patient Johnny Burgess D.C.#U05762 out from cell #H-4107.

The officer who pulls out the patient after placing him in handcuffs is responsible for first conducting an unclothed ('strip') search of that patient to ensure he has no weapon or other contraband on him, and is also responsible for then securing the patient's wrists

11 of 20

properly in the handcuffs that would prevent the patient from removing the handcuffs. Regarding the unclothed search and handcuffing of patient Burgess this was the responsibility of Ofc. Campos.

After I showered, Ofc. Campos secured me in handcuffs and shackles and then constrained my mobility by interlocking the handcuff and shackle chains to the sliding bolt device of the therapeutic activity restraint chair where I was seated in order to watch television. At no time at all during dayroom activity was patient Burgess ever secured in a therapeutic activity restraint chair, nor did Ofc. Campos ever have a custodial grasp on patient Burgess at any of the times that Ofc. Campos allowed patient Burgess to walk around the dayroom area where all the other H-Dorm, Quad #4 patients were each secured in locked therapeutic activity restraint chairs, during dayroom activity on 29 September 2023.

As briefly mentioned on page 10 of 20, in late June of 2022 I reported Sgt. Peacock's misuse of property restriction and H-Dorm staff's subsequent negligence in conducting proper security checks every thirty minutes as required by prison policy, and their contribution to the death of an elderly, handicapped patient in H-Dorm, Quad #4.

As a result of the e-mails I sent out and subsequent complaints I made about this H-Dorm staff (including Sgt. Peacock) threatened me with retaliatory violence, until Sgt. Duckwiler assaulted me with the assistance of other patients on the 4:00 pm to 12:00 am shift of 4 July 2022 during dayroom activity, which Inspector Heather Whitfield labored to unsubstantiate my complaint of in her Investigative Summary Report for the FDC's Office of the Inspector General. Ms. Whitfield moved for Case # 22-10947 to be unfounded.

With that incident in mind and knowing well how unsecured patients could be coerced by staff to assault another patient who's in restraints

12 of 20

during dayroom activity, I informed Ofc. Campos, after I showered during dayroom activity on 29 September 2023 that earlier that morning on the previous shift Lt. Knight and Sgt. Peacock both threatened to have me beaten up after the audit staff left and that I'd observed patient Burgess in the H-Dorm, Quad #4 group room slipping his hands out of his handcuffs.

    Ofc. Campos told me that he fully supported Lt. Knight and Sgt. Peacock's intent to have me beaten up. Shortly afterward, Ofc. Campos brought patient Burgess towards me, but then Ofc. Campos stopped walking and allowed patient Burgess to continue walking towards me.

    Before patient Burgess reached me I saw that he succeeded in very easily slipping his hand from the visibly loose handcuffs and brandishing a metallic-looking knife-like weapon, which I immediately looked directly at Ofc. Campos, who was only a few feet away, and advised him that patient Burgess was out of his handcuffs and was approaching me with a knife in his hand.

    Ofc. Campos made no effort to prevent patient Burgess from reaching me or attacking me. In fact, Ofc. Campos was very deliberate in allowing patient Burgess to continue striking my face, head, neck and back repeatedly while out of his handcuffs, and without once ordering him to stop. Patient Burgess knocked me unconscious, temporarily, as well.

    During the attack patient Burgess also pressed his clothed penis/genital groin area against me and said that I was a 'bitch.' At least on my head and hands that I can tell patient Burgess stabbed me, leaving me several defensive wounds on my hands as I tried to shield my head from him.

    After restraining patient Burgess on the ground Ofc. Campos told patient Burgess that he did a good job in beating me and that Lt. Knight and Sgt. Peacock would be pleased. But then Ofc. Campos

also told patient Burgess that he needed to slip back into the handcuffs before the other guards arrived and discovered that Ofc. Campos handcuffed patient Burgess loose enough for him to easily slip out of the handcuffs in order to assault me.

Neither Ofc. Campos or the other guards even attempted to retrieve the weapon from patient Burgess after he assaulted me.

Ofc. Campos told the other patients who were present and witnessed the incident that if any of them reported what they saw or heard, that Ofc. Campos, Lt. Knight and Sgt. Peacock would have them beaten next. Thus, patients gave no details on their witness statements.

I suffered serious pain, swollen eyes that later appeared to be bruised, a bloody nose, bruises to my upper body, several lacerations, puncture wounds from the knife, and swollen lumps on my head, defensive wounds from the knife on my hands, as well as utter terror.

I was handcuffed, shackled, immobile, defenseless, and locked down to the therapeutic activity restraint chair during this entire violent assault during which patient Burgess punched my face, broke my eyeglasses, and knocked them from my face.

Ofc. Campos was deliberately indifferent to my personal safety by having patient Burgess assault and injure me on behalf of Lt. Knight and Sgt. Peacock. This was devoid of any penological interest and thus, exceeded the bounds of due process of law.

I was escorted to the H-Dorm medical treatment room by H-Dorm Sergeant J. Greene. En route, Sgt. Greene told me that Lt. Knight and Sgt. Peacock had Ofc. Campos arrange to have me beaten up during dayroom activity, and that Ofc. Campos then had patient Burgess attack me so that Ofc. Campos didn't have to assault me himself and risk possibly getting in trouble.

Sgt. Greene also told me that if I reported this to anyone that Lt. Knight and Sgt. Peacock would have me killed the next

time. When the nurses began to assess me Sgt. Greene told them to stop the bleeding, clean the blood off, apply ointment to the open wounds, and then document on the Emergency Room Record Form DC4-701C and the Diagram of Injury Form DC4-708 that I only had a superficial scratch on my head, even after I vomitted in their presence in the medical treatment room.

Though I informed them, the nurses did not assess me for the temporary loss of consciousness or for being stabbed, and I did not see them document that I suffered any pain or other injuries.

Returning to Quad #4 Sgt. Greene told me that he wanted me to return seated in the dayroom within range of the fixed-position cameras and watch the television as if I am alright, otherwise I'd be assaulted again. This, I was forced to do even though I told Sgt. Greene and the nurses that my head really, really hurt, and that my eyes were even more discomfitted by the light than usual.

The nurses' failure to assess, treat, and document all of my injuries and pain that evening on 29 September 2023 is similar to how nurse Devon Burns failed as well on the evening of 4 July 2022 after I was assaulted and injured during dayroom activity in H-Dorm, Quad #4, at Suwannee Correctional Institution.

Also, this same Sgt. Greene, who actively assisted in covering up the nature and extent of the assault on 29 September 2023, is the same Sergeant John Greene who, on 5 July 2022, coerced patient Darryl Streeter D.C. #514988 into providing a Witness Statement Form DC6-112C wherein patient Streeter stated false facts designed to corroborate H-Dorm guards claim that I was not beaten up during dayroom activity on 4 July 2022.

There exists a long-standing common practice in H-Dorm for guards to have patients beaten up, sometimes with the assistance of other patients, and then for prison staff to rely on false facts in order

15 of 20

to cover-up the abuse. These aren't isolated incidents.

On 1 October 2023 Sgt. Peacock saw me trying to give staff my Inmate Sick-Call Request Form DC4-698A seeking medical attention to the injuries I suffered from the assault on 29 September 2023. Sgt. Peacock told me that he and Lt. Knight would ensure that I am not allowed to go be seen by medical staff and would reward patient Burgess for assaulting me, but then swore they would have me killed if I reported their involvement.

On 29 September 2023 Lt. Knight told me that she and Sgt. Peacock were behind Ofc. Campos having patient Burgess assault me, and that any prison grievance I submitted about it at SWCI would be intercepted and destroyed, not logged and responded to, and that I would be killed the next time if I tried to report them.

Now, I'm terrified to exit my cell for any reason since I could be assaulted by patients within camera range and by staff outside camera range. The guards can easily coerce patients to attack me.

Now that terror prevents me from exiting the safety of my cell I am no longer able to access out-of-cell therapeutic activities; ie., individual and group therapy, psychiatric, MDST, and medical call-outs, outdoor recreation, or dayroom activity.

On 3 October 2023 I turned in several prison grievances at SWCI on Form DC1-303 to complain about Lt. Knight, Sgt. Peacock, and Ofc. Campos' involvement in patient Burgess assaulting me, and about nursing staff failing to completely assess, treat, and document all my injuries and pain after Sgt. Greene instructed them not to, and to request protection and be evaluated by mental health staff since I'm very depressed about abuse that I can't take anymore.

To date, I've received no Part-C Receipts for the aforementioned grievances which I suspect were intercepted and disposed of. WHAT ELSE CAN I DO BUT COMMIT SUICIDE?

16 of 20

Fearing the threats of repeated violence I submitted several prison grievances to SWCI warden on Form DC1-303, against Lt. Knight, Sgt. Peacock, Sgt. Duckwiler, Ofc. Smith and Ofc. C.I. Butcher concerning their 7 September 2023 abuse and threats, and against Ofc. Smith for threatening and abusing me on 12 July 2023; 1 September 2023; 5 September 2023; and 7 September 2023.

I never received any Part C-Receipts for any of the grievances that I submitted on 11 September 2023, and fear staff intercepted them and disposed of them before they could be logged or responded to. On 2 October 2023 I appealed them.

Should this be the case it is not an isolated recurrence, and my ability to exhaust my administrative remedies are blocked.

Lt. Knight and Sgt. Peacock tell medical Dr. Islam, M.D., which patients to treat and to neglect. Such was the case on 13 September 2023 when Sgt. Peacock told Dr. Islam not to treat me after I complained that I could not use my left hand since a guard at Santa Rosa Corr. Inst. smashed it with his radio in late April 2023 and that the foreign body remained lodged in my neck, was painful and had caused blood to come up after a guard at Santa Rosa Corr. Inst. stabbed it in my neck on 11 April 2023. As a result, Dr. Islam refused to treat me.

Lt. Knight and Sgt. Peacock also tell H-Dorm's MDST members which patients to restrict or discharge, who then implement Lt. Knight and Sgt. Peacock's recommendations.

Now, with my efforts to complain about H-Dorm's mismanagement I fear Lt. Knight and Sgt. Peacock will make good on their threat to have MDST discharge me so I'd be returned back to Santa Rosa Corr. Inst. where they can have me killed

17 of 20

like Sgt. Duckwiler had me severely beaten on 13 September 2022 after MDST in H-Dorm discharged me and I was transferred from SWCI back to Santa Rosa Corr. Inst. on 15 July 2022. Please refer to: <u>Watson versus Suwannee Correctional Institution</u>, Case No.: 3:22-cv-754-MMH-PDB and to: <u>Watson versus Suwannee Correctional Institution</u>, Case No.: 3:22-cv-01443-MMH-LLL; the two complaint letters that I filed in 2022 in the United States District Court, Middle District of Florida, Jacksonville Division.

But just like I attempted shortly after my TCU discharge (on 10 August 2022 I was hospitalized after a suicide attempt, and again on 7 April 2023), I WILL KILL MYSELF BEFORE I LET THEM KILL ME OR TORTURE ME AGAIN...

## IV. Substantial Risk of Serious Harm

As I've begun to advocate for myself with prison grievances, court litigation, and by reaching out to outside agencies and any other free world source willing to hearken my pleas for help, year after year has passed my loss of blood and more blood.

Now and here, in the bowels of my misery guards and mental health staff conspire to bring my demise. Even now, there is talk to beat me up or discharge me from TCU and return me back to CM in isolation, either of which will provoke me to suicide.

This poses a substantial risk of serious harm to me. As my mental health record indicates I cannot handle, and decompensate from, the stressors of CM after nearly twenty consecutive years on CM status.

18 of 20

Such an arbitrary move to return me to CM will drive me to commit suicide just as surely as another instance of physically or sexually abusing me. Mentally, I can no longer tolerate such torture. This is why, for years, I have requested, unsuccessfully, to be placed in the Residential Continuum of Care (STU).

For reasons such as the 7 September 2023 beating of Alex Knight and my own on 12 July 2023, I'm left traumatized and terrified of being in 'blind spot' areas where the range of fixed-position cameras do not cover. Now, I am too afraid to even enter the large group room on Quad #4 in H-Dorm. This makes me flash back to previous beatings in such areas. I can no longer attend therapy sessions in there; I'm too frightened.

During the time it's taken to complete this 'Notice,' I've been so overwhelmed by stress of anticipating more abuse I've had to bust my head open twice, secretly, to let the bloody pressure spill into the toilet. Such seems to be my only recourse to relief in the presence of such adversity.

Remaining in H-Dorm under its current state of mismanagement and reign of terror will be detrimental to me. My mental health cannot improve under such abusive conditions. My dilemma lies between H-Dorm and CM. In either one I will die.

I do not know what else to do except seek meaningful intercession on my behalf. Please notify the FDC's Central Office of Health Services - Mental Health Director; FDC's Director of Region Two; and SWCI's Assistant Warden of Programs of the abusive conditions in H-Dorm and CM that I languish in, and how either will result in the substantial risk of imminent serious harm or worse to me by staff, or by my own committment to suicide as an alternative. This is my end.

PLEASE HELP ME BEFORE I DIE.

19 of 20

## SWORN DECLARATION

I, Tyson N. Watson, do hereby declare under the penalties of perjury, that I have read the foregoing 'Notice' and that the facts contained therein are true and correct.

Respectfully submitted this 4th. day of October 2023.

/s/ Tyson N. W$\cancel{A}$

## NOTARY CERTIFICATE

COUNTY OF SUWANNEE
STATE OF FLORIDA

This Document Was Acknowledged Before Me This _____ Day Of _____, 2023,
By: Tyson N. Watson
who produced Identification: FDC #195947
and who did take an oath.

_____
Signature of Notary Public

_____
Name of Notary Typed, Stamped or Printed

(Seal):

20 of 20